Good morning, Your Honors, and Your Honors. My name is William Broberg. I represent Jorge Luis Esquivel-Ortega, the defendant appellant. And for Mr. Esquivel-Ortega and for myself, thank you very much for hearing me this morning on his behalf. The defendant appellant raises four issues in this appeal. One, the sufficiency of the evidence to convict him of conspiracy and also possession with intent to distribute cocaine. And also, whether it was plain error for the district court to give a deliberate ignorance instruction in this case. And we also raise misconduct in opening and closing argument. And finally, two instances we believe that are clear from the record of ineffective assistance of counsel here. Taking them in order, as to the sufficiency claim, there really is no quibble between us and the government. This really does turn on knowledge and whether sufficient proof of knowledge was presented. What we have is Mr. Esquivel-Ortega's presence as a passenger in a van that had traveled from California to Washington. Along with his wife and 10-year-old daughter and the driver of the van at the time of the stop, who was a man named Aram Sanchez Sandoval. The record is a little bit confusing about the relationship between Mr. Esquivel-Ortega and Mr. Sanchez Sandoval. For instance, Mr. Esquivel-Ortega's lawyer says they're not related. And, of course, that isn't evidence in opening statement. And there was evidence, actually, from a Detective Shavers, a hearsay statement attributed to Mr. Esquivel-Ortega, that Mr. Sanchez Sandoval was his cousin, which that is the evidence in the record and for her. There's no evidence that Mr. Esquivel-Ortega was driving. None except for another hearsay statement also through Detective Shavers. That's the Renton Police Department that Mr. Esquivel-Ortega said that he not driving at the end. Is that your question, Your Honor? Driving. Driving at all. There is. He certainly wasn't driving at the time the van was stopped. Absolutely not. But what is the evidence? Obviously, you pinpointed the issue. How much did he know about what was going on? And, of course, it's the government's duty to establish beyond a reasonable doubt. But is there any evidence that he was driving at some point? A speck. And that is another hearsay statement through Detective Shavers again. Whose statement? Whose hearsay statement? Mr. Esquivel-Ortega. That he said that he had been sharing the driving. Sharing driving. Yes. Sharing driving. And that wasn't contested in opening statement of the defense attorney. He said sharing driving. It seems to me that the only evidence other than his presence that arguably links Esquivel-Ortega is the telephones. And both his wife, he did not – there was no evidence that they saw him with a telephone. Right? They saw his wife with a telephone. And there's some evidence about the intercepted calls from which it's possible he was heard, but nobody really knows. Is that basically it? Well, yes, Your Honor. But I think the defense attorney there got it kind of half right. I actually think the evidence is better for Mr. Esquivel-Ortega. Because if you look at the sequence of when Exhibit 19, the call, the call from the van to Pedro, and that's not disputed that that happened, that was 5.59 to 6.01 p.m. And we know from Agent Smith of the DEA that he set up, you know, trying to find this vehicle at about 6 p.m. And we know that the car was pulled over after it stopped for gas. The driver, Iram Sanchez-Sandoval, is out on his cell phone, goes into a gas station, comes back out, they follow him, they stop him at about 6.30. And we know at the time of the call, Pedro says you're about 15 minutes away. If you look at Exhibit 19, what I think is very interesting is I think it's very clear that the driver of the van was actually the person on the phone at that time. Because he uses, he doesn't say, so we make a left. He says, so I make a left. I go on this road.  And we know that it wasn't you. Mr. Sandoval, is it clear at that time that the other person was driving? I'm sorry? Is it clear that at that time the other person was driving? I'm saying from this sequence, it's highly unlikely that, you know, Mr. Esquivel or Ortega was driving, talking on that phone. They made another stop, changed drivers, and then went to the gas station. I think that where you see the times. You mean at the time that the car came to the gas station, the other fellow was driving? Absolutely. I see. So that's from which we surmise that before that, until they got to the gas station, the guy was driving. Yeah. You look at the time of the phone call, 559 to 601 p.m. You look at when Agent Smith set up surveillance, approximately 6 o'clock. You look at the time of the stop, 630. You look at the distance traveled. I think it was Aram Sanchez-Sandoval. I think the evidence points strongly in that direction. Now, is there anything on the phone calls while they were driving such that somebody else in the car would have overheard and known something was going on? Absolutely not. I mean, I think when you examine the phone call transcripts, it's, you know, the person who was talking to this Pedro person obviously had a familiarity with him in Exhibit 19. He calls him Pedrin. I am assuming and do not know, but that that's a term of familiarity. It's not Pedro. And, you know, Mr. Esquivel Ortega, according to Detective Shavers, says we're going to Pedro's house. And then through cross-examination, it was kind of unpacked that he didn't really know Pedro. And he told the detective that. There was nothing to source the vehicle to the defendant either. Is that right? That's correct. Well, wait a minute. Wasn't there evidence that, like, he sort of procured, not the right word, but he obtained a vehicle that belonged to one of his relatives? Well, that's what's interesting. The defense attorney says in opening they're not related, but the evidence that comes in, you know, the evidence that's considered by this jury is that Mr. Esquivel Ortega said they were related, that the van belonged to one of his wife's family members who was also in the van. That's Irem Sanchez-Sandoval. You know, you have about two minutes left. You have about two minutes left. Maybe you want to save a minute for Revella, but can you spend, like, a minute on the Jewell instruction? Yes. I think the Barron case is very instructive here, and I also think there's kind of, between our briefs, you have Sanchez Excuse me. Pardon me. You have the Barron case, and you have Sanchez-Robles. And the Barron case, I think, stands for the, you know, controversial rule that there is an evidentiary minimum that must be shown before you can have access to this kind of knowledge substitute in instruction. And, you know, there's three things. You have to have your suspicion aroused. You have to deliberately avoid taking steps to confirm or deny those suspicions. And that you also did so in order to provide yourself with a defense. And that's what the Barron case turned on. You know, there was no evidence that he was, you know, deliberately ignorant to provide a defense. Counsel, you're down to about a minute. If you want to reserve, you may do so. I appreciate it. Thank you very much. We'll hear from the government. May it please the Court, good morning. My name is Jill Otake, and I represent the United States in this matter. There was significant circumstantial evidence in this case produced to show both that the defendant had knowledge of the drugs in the van, and also that the defendant Such as? Such as. Well, let's start, first of all, with his explanation about what he was doing. He told the detective at the scene that he was going on a vacation. Keep in mind, however, he had left at 10 o'clock at night with a table. Well, you know, I know people who went, many people who, when their children were small, would do exactly that, so that the children would sleep and they would drive all night. I think that makes sense as well, Your Honor, except when you couple that with the fact that she's a 10-year-old school-aged child. They're leaving on September 28th, which is a Saturday night. They are driving nonstop. It's at the end of September, which means that school is likely to be open. What is the evidence, by the way, that they drove nonstop? We have evidence from the phone calls, first of all, that the person who was the distributor of the drugs, Emanuel, in California, called Pedro and told him that they had left at about 10 p.m. that evening. And that is the evidence that we believe shows that they had, in fact, left at approximately 10 p.m. It also is not unusual for people to take 10-year-old children out of school. I've done it. Well, that's not unusual, but when you take into account the fact that they're driving nonstop, they're leaving on a Saturday night to visit somebody in Auburn, Washington, and no offense to the Auburn Chamber of Commerce. It's not a vacation destination. They're driving to meet somebody named Pedro, who they had never met before. And once the van is stopped, Mr. Esquivel-Ortega never asks, Why are you searching my van? Why is there a dog here? Where are you taking my van? Why are you taking it away from me? When can I get my van back? He says that the van belonged to a relative of his, but he never makes any attempt to find out how he can get his van back. Instead, his reaction is that of somebody who is culpable. He starts to get very nervous and says, I need to get out of here immediately. My family is in trouble. Well, actually, by then it was 6.30 in the evening. In a place he doesn't know anything about, no way to get out of there. Right. But what makes sense, though, is if you're in that situation, you would want to find out how do I get my van back, not how do I get to the airport so that I can buy plane tickets so I can fly home. Of course, if it was the other guy's van, which there's some indication it was, and he was detained apparently for immigration reasons, he would certainly think, well, I'm not going to get the van back. It's not my van. I respectfully disagree with Your Honor's characterization that there was evidence that the van belonged to Iram Sanchez-Sandoval. In fact, there was not evidence of that. The defendant stated that the van belonged to his family members. Defense counsel is correct that there was not evidence explaining what the relationship was between Iram Sanchez-Sandoval and the defendant. The evidence was that I think, you know, what, the defendant made a statement that it belonged to his wife's relatives. Is that right? Something like that? The defendant said that the van belongs to his family members. At the time that he was ---- Well, what family members? Didn't he say wife's relatives? At the time he was arrested, he said, that's my wife's family. Yeah. Not his family. The wife's family. Right. He did say that when at the time he was arrested. But so what we have here is somebody who is behaving in a manner that is indicative of either knowing what's in the van or having a strong belief of what's in the van. He's basically, first of all, not asking the logical questions. How can I get my van back? It's only reasonable and logical that if you're under ---- in that situation ---- Well, the other thing I can say with some certainty that if one is stopped by the police, one doesn't ask many questions. I'm sorry? If one is stopped by the police, it's not unusual to just not ask many questions. Well, he did ask some questions, though. He said he asked how to get to the airport. He wanted to get to the airport. He felt comfortable enough with this ---- Well, that was after the van had been detained. Right. And my point is, somebody, a reasonable person under that circumstance with no knowledge or no suspicion of what's in the van would not say, my family is in trouble, I need to get out of here, I need to go to the airport. What they'd say is, how can I get my van back? I don't have any information about how I can get my van back. It's the law. But he did ask for the phone number. Well, it's not his van. Well, it does belong to his family member. It belongs to his wife's family. Did his wife say anything about how do I get my van back? She did not. But even if it was his wife's family member's van, it's still reasonable. It was his wife. Why didn't you arrest his wife? I think there's an argument that could be made that we should have. It seems to me there's much more evidence connecting her with this than to connect him. Isn't there? She did not react the same way that he did. He was the only one. Well, the only evidence you have is his reaction to the Beanstalk. Is that all you have? That, plus the circumstances. What are the circumstances? That was the first question somebody asked you.  The circumstances were that they left at 10 o'clock at night on a Saturday. No, you went over that. But you said other circumstances surrounding, you know. I mean, what gives rise to knowledge? That they left at 10 o'clock means he has knowledge? That they drive. Well, let's get more specific. Was there any smell of marijuana or cocaine, whatever the drug was here? There was not. We know that the cocaine was hidden. Was there any obvious compartment that someone who was innocent would have to know about? There was not an obvious compartment. The compartment was in the spare tire location. It was bondoed over. The tools for that bondo were found inside the van. It was well hidden because, I mean, even on the cursory search, the police couldn't find it, right? They had to take it to the garage and tear it. The dog couldn't even sniff it. It was well hidden, Your Honor. So there's no reason why he should have known about it. Except that logic tells us that if you're going to trust somebody to drive $250,000 worth of cocaine in a hidden compartment, in a spare tire hidden compartment from California to the Seattle area, if you have a flat tire, what are the chances of that innocent person discovering cocaine? Well, the trusted person could have been the other driver. You know, there was a year-long investigation of this drug ring. His name never came up during that year, right? That is correct. Never surfaced. Never connected with this. And, you know, all these phone calls, they intercepted. Right. But that in itself is not surprising because we know, and as we argued in closing argument, we were not arguing that he was the kingpin. Well, you argued a lot of things in closing argument. We did. Like, you know, it's common knowledge that, you know, couriers take their family, right? Right. There was no evidence of that. Well, defense counsel in closing argument made that same argument. But there was no evidence of that, was there? There was no evidence of that, but I think it's a reasonable argument that could be used. But it was also said, for example, that, I mean, a lot of the argument was disturbing because there was argument that he said he was going to give information. He never said that. There was argument that they didn't have luggage. They did have luggage. There were things said that were just not in the evidence. I don't recall that there being – I'm sorry, the luggage argument, Your Honor. Yes. There was only one piece of luggage in the car. What's the evidence that he was on the telephone, on the cell phone? We don't have evidence that he himself was on the cell phone. We do have evidence that the cell phone was in his wife's hand at the time of the stop. We also know that he could not be excluded as the person speaking to Pedro. Additionally, with regard to Pedro, what do we know? We know that the defendant necessarily would have had to have been present when the drugs were unloaded at Pedro's house. The van was stopped two blocks from Pedro's house. The tools for resealing the van, the hidden compartment, were still in the van. It only makes sense that the defendant would have been present, A, to meet Pedro, and, B, to see the removal of the drugs. It might have been more intelligent then to wait until all that happened before he was – before the van was stopped and impounded. I'm sorry? It might have made more sense to wait until all that happened before the car – the Well, and the reason why the decision was made in this case was because we didn't want, obviously, the suspects to know that we had a wire going. It doesn't make sense that for a – So it wasn't when you get back to Pedro that the car had been impounded? Well, he – if you read the transcript, Pedro does start to get nervous that the car is missing, but he doesn't know why. The reason given to the defendant was that it was stopped for speeding. What about the fact that Ismael Ortega then goes back to his house and goes back to his job and doesn't try and abscond or disappear or in any way suggest that he thinks anybody is coming after him? He did that because he thought, first of all, he had been released by the government. He didn't think the authorities were coming after him. But if somebody knew there was drugs in the van and that it was going to be discovered when they went through the van, they might have been somewhat concerned about going back out to their own house and getting arrested two years later, which is what happened to him. Right. But as he said at the time of his arrest, I thought you guys let me go. He thought he was getting off scot-free. I guess the final point I'd like to make – Were there other co-defendants prosecuted here? Sanchez, the driver, and Esquivel's wife? Esquivel's wife was not charged. Sanchez, the driver, was charged, but he has been on warrant status. He's been on what? On warrant status. Meaning? He has not yet been apprehended. Oh. But he was, in fact, detained and then let go. He was. He was, Your Honor. And I guess the final point I'd like to make is that – Which is sort of a good example. I mean, he disappeared because he had reason to think he was in trouble. This other guy didn't disappear. Well, part of why he disappeared was because he – I'm presuming – I don't know this for a fact, but I'm presuming he was deported because he was taken into immigration custody. It doesn't make sense for a conspiracy of this sort to entrust an innocent person to meet Pedro. It doesn't make sense for a conspiracy of this sort to entrust an innocent person. What about the wife and child? The child, I think, is easily – easily explainable. A child is not – it's understandable that a child would be – In other words, the government's theory is that the wife and child were essentially decoys. Well, why wasn't Esquivel Ortega and the wife and the child decoys? The reason why Esquivel Ortega himself was not a decoy is we have the circumstantial evidence of his reaction at the time that the van was seized tells us that he knew what was in the van. His wife is not behaving in the same way he is. Iram Sanchez-Sandoval is not behaving in the same way he is. He's the only one who, first of all, the police believed was linked to the van. That's why they asked him to sign the consent to search form. He's the only one who said his family members owned the van. He's the only one who didn't – who broke down crying at the time the van was seized and said, my family is in trouble. I need to get out of here. And he's – again, it only makes sense that somebody in that circumstance would not ask – would fail to ask questions such as, how do I get my van back? Thank you, Counsel. Your time has expired. We'll hear from Mr. Broberg. You have some reserve time. I just have one point. Let me just ask you, what do we make of the crying? The defendants started to cry when they took the van away. We realized when Iram Sanchez-Sandoval was going to be taken into custody and that he is with his wife and kid without luggage in a strange place, oh, my God, something's going on here. And, you know, I think he had awareness that something was really bad at that point. In other words, aside from being stranded on the side of the road, once the car was impounded, he knew there was something up. Well, this guy's getting arrested. This is happening. I mean, it's really serious stuff. And up until that point, you know, no one's saying he's nervous or doing anything wrong. He's not, you know, telling inconsistent stories like the defendant in the van. And I see my time is up. Thank you so much for listening. Thank you, Counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Tashima, Berzon